1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>              **Plaintiff-Appellee,**<br><br>                    **v.**<br><br>**DEVIN W. MEANS,**<br><br>              **Defendant-Appellant.** | **1:05-CR-0360 OWW**<br>**6:04-MJ-0219**<br><br>**MEMORANDUM DECISION AND**<br>**ORDER RE: APPEAL** |

## I.   INTRODUCTION

Devin W. Means appeals Magistrate Judge William M. Wunderlich's denial of his motion to dismiss citations issued to him by the National Park Service ("NPS") for driving under the influence, 36 C.F.R. § 4.23 (a)(1); driving while under the influence of alcohol with a blood alcohol content in excess of .08%, 36 C.F.R. § 4.23(a)(2); and speeding, 36 C.F.R. § 4.21. (Doc. 21.)

Means was arrested on a Friday evening, October 22, 2004, and held overnight in NPS custody. The next morning, without having been arraigned, he was released from federal custody pursuant to an "order setting conditions of release and appearance bond" which imposed certain conditions on Defendant, including the requirement that he appear before the magistrate judge a few weeks later. It appears that the order was "pre-signed" by the Magistrate Judge, executed by Means in the

**1**

presence of an NPS employee, and that Means did not appear before a judicial officer with respect to the conditions of his release. Overnight, however, Madera County Parole officials issued a parole detainer against Means.  Based on that detainer, NPS took Means into custody again (immediately after his release on the federal charges) and transported him to Mariposa County Jail, where he remained for six days until Madera County picked him up on the state parole hold.

For various reasons, further outlined below, Means did not make his initial appearance before Judge Wunderlich until 173 days after his arrest.  Means moved to dismiss the federal citations, arguing, among other things, that his transfer to Mariposa County Jail violated the Interstate Agreement on Detainers, and that the 173 day delay between his arrest and his arraignment violated Federal Rule of Civil Procedure 5, his Fourth Amendment and due process rights, his rights under the Local Civil Justice Reform Act Plan, and his Sixth Amendment right to a speedy trial.  Judge Wunderlich denied the motion. Means conditionally pled guilty to one count of driving under the influence in exchange for the voluntary dismissal of the speeding citation and an additional driving under the influence citation. His sentence, twenty four months probation and a $1,500.00 fine, has been stayed pending this appeal.

Means timely noticed his intent to appeal the magistrate's denial of his motion to dismiss.  He filed his opening brief on December 5, 2005.  (Doc. 21.)  The government filed its response brief on September 18, 2006.  (Doc. 26.)  Means replied on September 25, 2006.  (Doc. 27.)

**2**

1

## II.  BACKGROUND

2    On Friday, October 22, 2004, at approximately 4:00 p.m.,

3  National Park Ranger Gayeski-Peters observed a vehicle driving in

4  excess of the speed limit within Yosemite National Park.  the

5  ranger pulled the vehicle over and identified the driver as Devin

6  W. Means.  The Ranger noticed a strong odor of alcohol and

7  observed that Means had red, watery eyes and was slurring his

8  speech.  Upon further questioning, Means admitted that he had

9  been drinking.  The Ranger administered field sobriety tests,

10  during which Means exhibited signs of impairment.  A field breath

11  test given to Means indicated the presence of alcohol in his

12  system.  The Ranger placed Means under arrest at 4:20 p.m. for

13  Driving Under the Influence of Alcohol.

14    Defendant was taken to the Yosemite holding facility, where

15  two additional breath tests were administered.  The first test

16  indicated that Means' blood alcohol content was .21%; a second,

17  administered at 4:47 p.m., indicated a blood alcohol content of

18  .19%.  Means was then formally charged with Driving Under the

19  Influence, a violation of 36 C.F.R. § 4.23 (a)(1); Driving While

20  Under the Influence of Alcohol with a Blood Alcohol Content in

21  excess of .08%, a violation of 36 C.F.R. § 4.23(a)(2); and

22  speeding, a violation of 36 C.F.R. § 4.21.[1]

23    The Rangers discovered, upon reviewing Means' criminal

24  history, that he was on California state parole.  (ER 17.)  The

25  State was notified that Means had been arrested.  *Id.*  The next

26  morning, at approximately 10:15 a.m., NPS received by fax a

27  "Request for Detainer to be Placed on a Prisoner" from California

28

[1]    All of these are misdemeanor offenses.

**3**

1  State Parole Agent E. Muro.  *Id*. at 28, 32.  The detainer

2  indicated that Means should be held under Penal Code

3  § 3056.[2]

4      That same morning, Means was released from federal custody

5  on the DUI/speeding violation and signed a Standing Order of

6  Release and Appearance Bond, issued by the magistrate court, but

7  presented to Means by an NPS employee, setting forth certain

8  conditions of release and scheduling an initial appearance for

9  November 16, 2004.  However, NPS took Means into custody on the

10  California detainer and delivered him to the Mariposa County

11  Adult Detention Center at approximately 2:00 p.m. on Saturday

12  October 23, 2004.  Means was held at Mariposa for six days.  He

13  was then transferred to the custody of the Madera County

14  Department of Corrections, where he was held on the ground that

15  his DUI arrest in Yosemite constituted a violation of his state

16  parole administered in Madera County.  The Madera County Superior

17  Court imposed a ten month sentence -- five months in state

18  custody; five months on house arrest -- on Means for his parole

19  violation.

20      While Means was in state custody, he failed to appear before

21  the magistrate judge in Yosemite on November 16, 2004, his

22  scheduled appearance date, required by the Order Setting

23  Conditions of Release and Appearance Bond.  (CR 3.)  A federal

24  warrant was thereafter issued for his arrest for his failure to

25  appear.  On March 20, 2005, the California State Corrections,

26

27      [2]  California Penal Code § 3056 (Legal custody;

28  reimprisonment) provides that "Prisoners on parole shall remain
under the legal custody of the department and shall be subject at
any time to be taken back within the inclosure of the prison."

**4**

Madera Unit, notified NPS that defendant was serving time on state charges.  (ER 19.)  On that same day, NPS faxed a copy of the federal arrest warrant to Madera County to serve as a detainer upon the release of defendant from state custody.  (ER 33.)

On or about March 30, 2005, Means was transferred from state custody to home electronic monitoring.  (ER 33.)  On April 5, 2005, Means contacted the Yosemite Legal Office and set a date, April 12, 2005, for his initial appearance.  (ER 19.)  Means made his rescheduled initial appearance, approximately 173 days after his arrest.  He entered a plea of not guilty and was assigned a federal public defender.

On May 27, 2005, Means filed a motion to dismiss the charges against him, on the grounds that his continued custody by the NPS the morning after his arrest violated the Interstate Agreements on Detainers ("IAD"), as well as the Fourth and Fifth Amendments. In addition, Means maintained that the delay in presenting him before a magistrate violated Federal Rule of Criminal Procedure 5, the local Criminal Justice Act Plan of the Eastern District of California, and the Fourth Amendment. Finally, Means argued that the delay between filing of the charging documents and his arraignment violated his Sixth Amendment right to a speedy trial. (ER 1-2.)

On June 29, 2005, the magistrate judge denied the motion to dismiss, finding that the IAD did not apply to Means's incarceration, the 173 days between the arrest and presentment did not violate Rule 5 or the Fourth Amendment, and the delay between the filing of the charging documents and the arraignment

was not unreasonable.  (ER 37-38.)  Specifically, the magistrate judge ruled:

> All right, this is my ruling.
>
> I conclude that upon the filing of the detainer by the State of California and on the signing of his OR release, he ceased to be a federal prisoner; that as a federal – former federal prisoner, the people here in Yosemite, as a courtesy to the state, transported him down to Mariposa. But I don't find that to be of any significant legal consequence. He was a state prisoner from the time he signed his OR release and theron. And whether the state messed up in not coming and getting him for six days is of no legal consequence in this [sic] proceedings.
>
> The motion to dismiss is denied.

(Tr. 20.)

On August 23, 2005, Means entered a conditional plea of guilty to operating a motor vehicle with a blood alcohol concentration in excess of .08, in exchange for which the Government agreed to dismiss the remaining charges of driving under the influence and speeding.  (Doc. 13.)  On September 20, 2005, Means was sentenced to twenty four months probation and a $1,500.00 fine, which were stayed pending appeal.  (ER 45.)  On September 30, 2005, Means timely noticed his appeal to the district court.  (ER 42.)

### III.    **Questions Presented**?

1.   Did Mr. Means's continued federal custody, after he was released on his own recognizance, violate the Interstate Agreements on Detainers ("IAD"), 18 U.S.C. App. 2 § 2 (1970), and constitute an illegal seizure in violation of the Fourth Amendment and a deprivation of liberty without due process of law?

**6**

2.    Did the 173-day delay between Mr. Means's arrest and his first appearance before the United States Magistrate Court violate F. R. Crim. P. 5, the Mallory rule, the local Criminal Justice Act plan, and the Fourth Amendment?

3.    Was the 173-day delay between the filing of the charging documents in this case and Mr. Means's initial appearance unreasonable and did it violate his Sixth-Amendment right to a speedy trial under Doggett v. United States, 505 U.S. 647 (1992), and Barker v. Wingo, 407 U.S. 514 (1972)?

4.    Assuming that a violation of Mr. Means's rights relating to presentment before the magistrate court is found, what is the appropriate remedy?

### IV.   **STANDARD OF REVIEW**

A district court reviews de novo a magistrate judges' denial of a motion to dismiss an indictment on constitutional grounds. *See United States v. Bueno-Vargas*, 383 F.3d 1106 (9th Cir. 2004.)

### V.   **DISCUSSION**

**A.   Did Mr. Means's continued federal custody, after he was released on his own recognizance, violate the Interstate Agreements on Detainers ("IAD"), 18 U.S.C. App. 2 § 2 (1970), and constitute an illegal seizure in violation of the Fourth Amendment and a deprivation of liberty without due process of law?**

   **1.   Applicability of the Interstate Agreements on Detainers to this case.**

The Interstate Agreement on Detainers ("IAD") is a "compact among 48 States, the District of Columbia, Puerto Rico, the

**7**

Virgin Islands, and the United States."  *Carchman v. Nash,* 473

U.S. 716, 719 (1985).  California has adopted the IAD.  Cal.

Penal Code § 1389.  The IAD is a congressionally sanctioned

interstate compact, and is therefore enforceable as <u>federal</u> law.

*Cuyler v. Adams*, 449 U.S. 433, 438-442 (1981).

A detainer is "a request filed by a criminal justice agency

with the institution in which a prisoner is incarcerated, asking

the institution either to hold the prisoner for the agency or to

notify the agency when release of the prisoner is imminent."

*Carchman*, 473 U.S. at 719.  "Detainers generally are based on

outstanding criminal charges, outstanding parole or

probation-violation charges, or additional sentences already

imposed against the prisoner."  *Id.*

The IAD was passed in order to avoid the "uncertainties

which obstruct programs of prisoner treatment and rehabilitation"

stemming from charges outstanding against a prisoner, detainers

based on untried indictments, informations or complaints, and

difficulties in securing speedy trial of persons already

incarcerated in other jurisdictions..."  IAD Art. I.  The purpose

of the IAD is "to encourage the expeditious and orderly

disposition of [outstanding] charges and determination of the

proper status of any and all detainers based on untried

indictments, informations or complaints."  *Id.*

> The inmate who has a detainer against him is filled
> with anxiety and apprehension and frequently does not
> respond to a training program. He often must be kept in
> close custody, which bars him from treatment such as
> trustyships, moderations of custody and opportunity for
> transfer to farms and work camps. In many jurisdictions
> he is not eligible for parole; there is little hope for
> his release after an optimum period of training and
> treatment, when he is ready for return to society with

**8**

> an excellent possibility that he will not offend again. Instead, he often becomes embittered with continued institutionalization and the objective of the correctional system is defeated.

*Carchman*, 473 U.S. at 720 (citing Council of State Governments, Suggested State Legislation, Program for 1957, p. 74 (1956)). The *Carchman* court succinctly summarized the operation of the IAD as follows:

> To achieve [the purpose of encouraging the expeditious and orderly disposition of outstanding charges and the determination of the status of any and all detainers based on untried indictments, informations or complaints], Art. III of the Agreement establishes a procedure by which a prisoner incarcerated in one party State (the sending State) may demand the speedy disposition of "any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner" by another party State (the receiving State). Specifically, Art. III requires the warden to inform the prisoner that a detainer has been lodged against him and that he may request final disposition of the indictment, information, or complaint upon which the detainer is based. If the prisoner makes such a request, the warden must forward it, together with a certificate providing certain information about the prisoner's terms of confinement, to the appropriate prosecuting official and court of the receiving State. The authorities in the receiving State then must bring the prisoner to trial within 180 days, absent good cause shown, or the court must dismiss the indictment, information, or complaint with prejudice, and the detainer will cease to be of any force or effect.

*Carchman*, 473 U.S. at 720.

But, by its own terms, the IAD only applies to individuals who are being held "upon a term of imprisonment in a penal or correctional institution of the sending state." IAD Art. III(a). Similar language is repeated elsewhere in the IAD. For example, Article IV(a) provides:

> The appropriate officer of the jurisdiction in which an untried indictment, information, or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term

**9**

1

2

3

4

5

6

7

           <u>of imprisonment in any party State</u> made available in
accordance with article V(a) hereof upon presentation
of a written request for temporary custody or
availability to the appropriate authorities of the
State in which the prisoner is incarcerated: Provided,
That the court having jurisdiction of such indictment,
information, or complaint shall have duly approved,
recorded, and transmitted the request: And provided
further, That there shall be a period of thirty days
after receipt by the appropriate authorities before the
request be honored, within which period the Governor of
the sending State may disapprove the request for
temporary custody or availability, either upon his own
motion or upon motion of the prisoner

8

Article IV(a).

9

10

    Means argues that, although he was released from federal

11

custody on conditions from Yosemite National Park, NPS "continued

12

to hold him in its custody and transport him, via patrol car, to

13

Mariposa County." (Doc. 21 at 6.)  The government argues that

14

Defendant was released from NPS custody then taken back into

15

custody for the sole purpose of transferring him to Madera County

16

under the authority of the state detainer.  Defendant insists,

17

however, that the IAD applies because he was "not simply held [at

18

Yosemite] on the basis of the Madera County detainer, while

19

Madera County decided whether to come get Mr. Means or waive its

20

right to do so as is the IAD procedure.  Instead, Mr. Means was

21

transferred to Mariposa County, which did not have a detainer

22

lodged with the Government, where he spent six days in the

23

Marioposa County jail, until he was ultimately released into the

24

custody of Madera County, which subsequently imposed a ten-month

25

sentence on Mr. Means for his violation of parole." (Doc. 27 at

26

2.)  But, Defendant does not explain the legal significance of

27

these facts.

28

    Critically, even if Means had remained in NPS custody, he

**10**

would not have been serving a term of incarceration.  Rather he would have been in pretrial custody, a form of custody that does not trigger operation of the IAD.  *See United States v. Reed*, 620 F.2d 709, 711 (9th Cir. 1980).  The factual circumstances in *Reed* were as follows:

> [A]ppellant was being held in a state facility in connection with federal and state charges when he was approached by a state officer seeking his cooperation with regard to another state offense.  Appellant agreed to cooperate, provided he was transferred to another state facility. After his transfer appellant was in state custody, but his records were marked "Hold for U.S. Marshals" by a state officer. Appellant now contends that this "hold" and his later removal from state custody for his federal arraignment, followed by his return to state custody required dismissal of these charges under Art. IV(e) of the Interstate Agreement on Detainers Act.

*Reed*, 620 F.2d at 711.  The *Reed* court adopted two alternative bases for concluding that Reed's rights under the IAD statute were not violated.  First, the Ninth Circuit Reasoned:

> [T]he federal government never lodged a detainer. While the notation "Hold for U.S. Marshals" might in some cases create a detainer within the meaning of the Act, it was not a detainer in this case since it was made by a state officer, without the direction of a federal agent or officer. The trial court considered extensive testimony from several officials familiar with appellant's incarceration status and properly concluded that there was no federal detainer.

*Id*.

More importantly for the instant appeal, the Ninth Circuit also concluded that Reed "was not serving a 'term of imprisonment' within the meaning of the statute."  *Id*.

> Appellant was in custody awaiting trial on state and federal charges and awaiting revocation of his parole arising out of an earlier state charge. The purpose of the Interstate Agreement on Detainers Act is "to minimize the adverse impact of a foreign prosecution on rehabilitative programs of the confining jurisdiction." *United States v. Milhollan*, 599 F.2d 518, 528 (3d Cir. 1979).  We agree with the decisions of other circuits

**11**

> that neither a pretrial detainee nor a parole violator
> has a sufficient interest in the rehabilitation
> programs of his confining institution to justify
> invocation of the Act. *United States v. Milhollan*,
> supra (pretrial detainee); *United States v. Harris*, 566
> F.2d 610 (8th Cir. 1977) (pretrial detainee); *United
> States v. Roberts,* 548 F.2d 665 (6th Cir.
> 1977)(pretrial detainee); *United States v. Dobson*, 585
> F.2d 55 (3d Cir. 1978)(parole violator).

*Id*. at 711-12 (emphasis added)(citations edited).

Defendant attempts to distinguish *Reed*, first arguing that, unlike in *Reed* where the Ninth Circuit held that the IAD did not apply because there was no detainer filed, it is undisputed that Madera County filed a detainer against Mr. Means.  (Doc. 27 at 3.)  Although this is correct, Defendant cannot escape the alternative holding: that the IAD simply does not apply to pretrial detainees or parole violators.  Defendant had no interest in the rehabilitation programs of the transferring jurisdiction.  The district court is bound to follow such alternative reasoning, even if it could arguably be considered dicta.  *See Barapind v. Enomoto*, 400 F.3d 744, 750-51 (9th Cir. 2005).

The *Reed* holding also applies to individuals who have been incarcerated on parole violations.  *Id*.  So, to the extent that Means argues that the IAD was violated while he was in state custody after the federal detainer/arrest warrant was lodged against him, the IAD does not apply to that situation either.[3]

---

[3]    The government addresses whether the IAD was violated with respect to NPS's filing of a detainer against Defendant while he was incarcerated in the state system even though it does not appear that Defendant makes any such argument.  In any case, such an argument would have any merit, as Defendant did not appear in federal court on the basis of the NPS detainer.  He was

1      Defendant also argues, unpersuasively, that the holding from
2  *Reed* simply does not apply to this case because *Reed* concerned
3  Articles III and IV of the IAD, both of which clearly apply only
4  to prisoners who are currently serving terms of incarceration.
5  Instead, Defendant suggests that this case is governed by
6  Articles II and V, provisions that Defendant argues are not
7  limited in their scope to only prisoners who are incarcerated.
8  But, even a cursory examination of the IAD reveals that Means'
9  argument is flawed.  Article II provides definitions of terms
10 utilized throughout the IAD, while Article V explains procedures
11 that must be followed by parties after a request is made under
12 either Article III or IV.  Therefore, the (post-conviction)
13 incarcerated prisoner limitation applies to the entire IAD.
14 There is no basis for applying Articles II and V to parole
15 violators or individuals held in pretrial custody.

16

17              **2.  <u>Fourth Amendment Violation</u>**.

18      Defendant next argues that even if "the IAD did not apply to
19 Mr. Means after he was "released" from federal custody, [] NPS
20 had no legal basis whatsoever on which to continue to detain
21 him...."  After Means was released from the Yosemite Holding
22 Facility on the federal charges, NPS took Means back into custody
23 on the state detainer faxed from the Madera County Department of
24 Corrections.  The government maintains that the detainer provided
25 NPS with independent probable cause to detain Means.

26

27 _____
28 not taken into federal custody and appeared of his own volition
   after his release from state custody.

**13**

An arrest comports with the Fourth Amendment if, at the moment of the arrest, the facts and circumstances within the arresting officers knowledge "were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). In California, probable cause is not required to arrest a parolee for a violation of parole. *People v. Kanos*, 14 Cal. App. 3d 642, 648 (1971).  The arrest of a parolee is more like "a mere transfer of the subject from constructive custody into actual or physical custody." *United States v. Rabb*, 752 F.2d 1320, 1324 (9th Cir. 1984)(quoting *People v. Villareal*, 262 Cal. App. 2d 438, 447 (1968)).[4]  Specifically, in California, "the written

---

[4]    Notably, in the federal system, a parolee does not enjoy "the absolute liberty to which every citizen is entitled, but only [a] conditional liberty properly dependent on observance of special parole restrictions." *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972).  The Second Circuit has held that the detention of a parolee under a parole warrant is not an "arrest as defined in the fourth amendment. *United States v. Polito*, 583 F.2d 48, 54-55 (2nd Cir.1978) (detention of parolee under parole violator's arrest warrant is not an "arrest" as defined in the Fourth Amendment).

> There is a logical reason to distinguish between the retaking of a parolee and the apprehension of one to be charged with a crime. The parole revocation procedure is not part of a criminal prosecution, and a parolee may be arrested and reincarcerated for reasons that would not permit the arrest or incarceration of other persons. Therefore, it is reasonable to assume an administrative warrant issued for retaking of a parolee should not be judged by exacting Fourth Amendment standards.

*Sherman v. Reilly*, 364 F. Supp. 2d 1216, 1219 (D. Or. 2005)(citing *Henrique v. U.S. Marshal*, 476 F. Supp. 618, 629 (D.C. Cal. 1979).

**14**

1   order of the parole authority shall be a sufficient warrant for

2   any peace or prison officer to return to actual custody any

3   conditionally released or paroled prisoner."  Cal. Penal Code

4   § 3060.  The detainer faxed to NPS, filled out on a California

5   Department of Corrections form 1018 ("Notice of Return to

6   Prison"), qualifies as a "written order of the parole authority."

7   Pursuant to California Penal Code Section 3060.

8       However, a question remains on what grounds a National Park

9   Ranger within the exclusive jurisdiction of Yosemite National

10  Park may hold an individual on a state parole warrant and

11  transport him to State authorities.  Pursuant to California Penal

12  Code Section 830.8, National Park Rangers may "exercise the

13  powers of arrest of a peace officer as specified in Section

14  836...provided these rangers are exercising the arrest powers

15  incidental to the performance of their federal duties...[and the

16  ranger,] prior to the exercise of these arrest powers, shall have

17  been certified by their agency heads as having satisfactorily

18  completed the training requirements of Section 832.3, or the

19  equivalent thereof."   Alternatively, it is possible for

20  California authorities to deputize persons from other

21  jurisdictions to effect the return of a parole violator:

22          [An] officer designated by the Governor pursuant to
            subdivision 5 of Section 11177 of this code may
23          deputize any person regularly employed by another state
            to act as an officer and agent of this State in
24          effecting the return of any person who has violated the
            terms and conditions of parole or probation as granted
25          by this State. In any matter relating to the return of
            such a person, any agent so deputized shall have all
26          the powers of a police officer of this State.

27          Any deputization pursuant to this section shall be in
            writing and any person authorized to act as an agent of
28          this State pursuant hereto shall carry formal evidence
            of his deputization and shall produce the same upon
            demand.

**15**

Cal. Penal Code § 11177.5.  There may also be other bases upon which NPS performed this accommodation for the State.  The record does not fully explain the <u>legal</u> basis for the NPS taking Means back into custody on the parole hold and transporting him to Mariposa.[5]  Although in some circumstances, a remand for the taking of further evidence on this question might be warranted, there is no need for a remand under the circumstances.  Even if Means was unlawfully detained on the parole warrant, his remedy is civil and lies elsewhere.  Dismissal of the federal DUI case is not justified on the basis that a federal law enforcement officer took Means into custody on a state parole hold and transferred him to state authorities.

Defendant's argument has one additional facet.  He maintains that, even if the government properly detained him, NPS had no basis (apart from the IAD, which does not apply) for transporting Means could to <u>Mariposa County</u>, rather than Madera County.  Mariposa had no outstanding charges against Means, but held him there for six additional days prior to being transferred to Madera County authorities.  The government does not directly respond to this argument.  Nevertheless, outside the framework of the IAD, Defendant does not explain how NPS's use of Mariposa county as a state custodial intermediary warrants dismissal of the federal charges against Means.  The state detainer has statewide effect under state law and, assuming the Park Ranger

_____

[5]    As this is likely a common occurrence, it seems equally likely that either the National Park Ranger was cross-deputized or that NPS was otherwise authorized to do so.  No evidence was submitted on the issue of cross-deputization.

had authority to detain Means on the parole warrant, Means could
be placed in any state detention facility en route to Madera
County, the requesting authority.

### 3.   Alleged Due Process Violation.

Although the first question presented by Defendant on appeal
raises the issue of "deprivation of liberty without due process
of law," Means offers no argument or legal authority to support
the existence of a due process violation under the facts and
circumstances of this case.

**B.   Did the 173-day delay between Mr. Means's arrest and
his first appearance before the United States
Magistrate Court violate F. R. Crim. P. 5, the *Mallory*
rule, the local Criminal Justice Act plan, and the
Fourth Amendment?**

Defendant next argues that the 173 day delay between his
arrest and first appearance violated Federal Rule of Criminal
Procedure 5, the local Eastern District of California Criminal
Justice Act Plan, and the Fourth Amendment.

### 1.   Rule 5 - Presentment "Without Unnecessary Delay."

Federal Rule of Criminal Procedure Rule 5(b) provides that,
"if a defendant is arrested without a warrant, a complaint
meeting Rule 4(a)'s requirement of probable cause must be
promptly filed...."  Rule 5(a)(1)(A) requires that "[a] person
making an arrest within the United States must take the defendant
<u>without unnecessary delay</u> before a magistrate judge, or before a
state or local judicial officer...."[6]

---

[6]   The government incorrectly asserts that these rules do
not apply to misdemeanor offenses.  The requirements of Federal

1    The Supreme Court in *Mallory v. United States*, 354 U.S.

2   452-54 (1957), reaffirmed that the purpose of the prompt

3   arraignment requirement was to prevent law enforcement officers

4   from using the time between arrest and presentment to obtain

5   confessions. *See also United States v. Murray*, 197 F.R.D. 421,

6   423 (S.D. Cal. 2000).  To enforce this purpose, "incriminating

7   statements elicited from defendants during a period of unlawful

8   detention" are deemed inadmissible. *Mallory*, 354 U.S. at 453.

9   The *Mallory* Court held that "[p]rovisions related to Rule 5(a)

10  contemplate a procedure that allows arresting officers little

11  more leeway than the interval between arrest and the ordinary

12  administrative steps required to bring a suspect before the

13  nearest available magistrate." *Id*.  But, what actually

14  constitutes unreasonable delay "is to be determined in light of

15  all of the facts and circumstances of the case." *Murray*, 197

16  F.R.D. at 423.

17   Unlike the Fourth Amendment, which requires that a judicial

18  officer make probable cause determination within 48 hours of a

19  person's arrest if that person is to be detained pending further

20  proceedings, *County of Riverside v. McLaughlin*, 500 U.S. 44, 57

21  (1991), prompt presentment that satisfies Rule 5(a) "need not be

22

23  Rule of Criminal Procedure Rules 5(a), (b), (c), and (e), do
    apply to misdemeanors. *See United States v. Salivas-Gonzalez*,
24  147 F. Supp. 2d 58, 60 (D.P.R. 2001). *Salivas-Gonzalez* relied
    upon *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), which
25  held that if an officer has probable cause to believe an
    individual has committed a misdemeanor in his presence, he may,
26  without violating the Fourth Amendment, arrest the offender.  At
    the same time, the *Atwater* court reiterated the principal that
27  "anyone arrested for a crime without formal process, whether for
    felony or misdemeanor, is entitled to a magistrates's review of
28  probable cause within 48 hours..." *Id*.

**18**

within 48 hours of a person's arrest." *Murray*, 197 F.R.D. at 423

(citing United *States v. Van Poyck*, 77 F.3d 285 (9th Cir. 1996)).

Nor does Rule 5(a) require weekend or nighttime arraignments.

*Van Poyck*, 77 F.3d at 289-90.  Moreover, delays caused by

"transportation of the defendant, jurisdictional determinations,

availability of the magistrate judge, medical care or <u>the</u>

<u>intoxicated state of the defendant</u> are all legitimate delays and

not in violation of [Rule 5(a)]...." *Murray*, 197 F.R.D. at 423

(emphasis added).

Here, Means was arrested at 4:30 p.m. on a Friday and booked

into the Yosemite Holding Facility just before 5:00 p.m.  It

would have been presumptively reasonable to delay presentment

before the magistrate until Monday.  Instead, Means was released

on his own recognizance the following morning, after he sobered

up and signed a Standing Order of Release and Appearance Bond

from the United States Magistrate court for Yosemite National

Park, setting forth certain conditions of release and scheduling

Defendants initial court appearance in Yosemite for November 16,

2004.  The standing order is dated October 23, 2004, the date of

Means' release from custody.  It bears Judge Wunderlich's

signature, but it appears to have been signed in advance, as it

is undisputed that Means was not arraigned by Judge Wunderlich on

that date.

Means was not presented before a magistrate judge for a full

173 days after his arrest.  He was never advised of his right to

counsel or of any other federal rights until April 12, 2005.

Defendant asserts that he was prejudiced by this delay.

Specifically, he asserts that prompt appointment of counsel might

**19**

1    have ensured resolution of the federal charges against him while

2    he was serving his state parole violation sentence.  If this had

3    been the case, he would have had the opportunity to request "that

4    his federal sentence run concurrent with his state sentence."

5    This prejudice, Defendant suggest, warrants dismissal.  Defendant

6    was not given a custodial sentence on his federal charge so there

7    was no federal time in custody to run concurrent with his state

8    sentence.  Other "prejudice" is not suggested

9         The purpose of Rule 5 is to prevent law enforcement officers

10   from using the time between arrest and presentment to obtain

11   confessions.  *Mallory,* 354 U.S. at 452-54.  That is why

12   suppression of inculpatory statements made during detentions that

13   violate Rule 5 are subject to suppression.  *See United States v.*

14   *Studley*, 783 F.2d 934 n.2 (9th Cir. 1986)("the normal remedy for

15   violation of Rule 5(a) is suppression of evidence obtained during

16   the unreasonable delay"); *see also United States v. Morrison*, 153

17   F.3d 34, 56 (2d Cir. 1998); *United States v. Nazarenus*, 983 F.2d

18   1480, 1482-83 (8th Cir. 1993); *Lovelace v. United States*, 357

19   F.2d 306, 310 (5th Cir. 1966).  In contrast, Defendant has cited

20   no authority that suggests dismissal is an appropriate remedy for

21   a Rule 5 violation in a case where the delay was not used to

22   subject the defendant to unwarranted interrogation nor did any

23   federal law enforcement officers seek any benefit or advantage

24   from the delay.

25        **2.   Did the Delay Constitute a Fourth Amendment**
            **Violation?**

26

27        The Fourth Amendment imposes independent presentment

28   obligations on arresting officials.  For example, *Gerstein v.*

**20**

*Pugh*, 420 U.S. 103, 114 (1975), held that "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to <u>extended restraint of liberty following arrest</u>." More specifically, if a person is to be detained in custody pending further proceedings, a judicial officer must make a probable cause determination within 48 hours of the person's arrest. *McLaughlin*, 500 U.S. at 57. Here, however, Means was not detained by federal authorities pending further federal proceedings. Rather, he was almost immediately released on his own recognizance after he sobered up, so the *Gersten-McLaughlin,* 48 hour deadline does not apply. The fact that Means was detained by other state jurisdictions in excess of 48 hours on a parole violation is immaterial to the analysis. He was not detained by federal authorities on federal charges for more than 24 hours, let alone for more than the 48 hour Fourth Amendment touchstone.

### 3.   Did the Delay Violate the Criminal Justice Act ("CJA") Plan for the United States District Court for the Eastern District of California?

The CJA Plan for the Eastern District of California provides, in pertinent part:

> Presentation of Accused for Appointment of Counsel. Federal law enforcement and prosecutorial agencies, probation officers, and pretrial services officers in this district, and those acting on their behalf, <u>shall promptly ask any person who is in custody</u>, **or who otherwise may be entitled to counsel under the CJA,** <u>whether he or she is financially able to secure representation, and shall, in such cases in which the person indicates that he or she is not able, notify the Federal Public Defender Office</u>, which shall assign a lawyer to discuss with the person the right to representation and right to appointed counsel, and if appointment of counsel seems likely, assist in the

> completion of a financial affidavit (CJA Form 23) and arrange to have the person promptly presented before a magistrate judge for determination of financial eligibility and appointment of counsel.

Gen. Order No. 323, IX (A) (1996)(emphasis added).

The United States argues that the CJA Plan was not violated at all because Defendant was appointed counsel when he eventually made his initial appearance before the magistrate judge on April 12, 2005, after he was released from sate custody.  The government further argues that "any dely in the actual initial appearance and appointment of counsel was due to the defendant's failure to notify the Government of his incarceration, as required by the conditions of release, and failure to appear on his scheduled hearing date."  (Doc. 26 at 18.)  Defendant responds by arguing that the "conditions of release" imposed upon Means must be deemed invalid because they were not imposed by a "judicial officer."  *See* 18 U.S.C. § 3142(a) ("Upon the appearance before a judicial officer of a person charged with an offense, the judicial officer shall issue an order that, pending trial, the person be –(1) released on personal recognizance or upon the execution of an unsecured appearance bond... (2) released on a condition or combination of conditions.... (3) temporarily detained... or (4) detained....").

Perhaps most importantly, Defendant argues that he was prejudiced by the delayed appointment of a federal defender. Specifically, Means asserts that had counsel been appointed on the federal charges in a more timely manner, his federal attorney could have demanded that Means be transferred (pursuant to the IAD) to federal custody to resolve his federal claims.  Had this

22

1   happened, Means could have petitioned to have his federal

2   sentence run concurrent with his state sentence.   The sole

3   "federal sentence" was 24 months probation and a $1,500 fine.

4      But, again, Defendant cites no authority to support the

5   proposition that <u>dismissal</u> of the federal charges is an

6   appropriate remedy where a CJA plans violation has occurred.[7]

7

8      **C.   <u>Was the 173-day delay between the filing of the
        charging documents in this case and Mr. Means's initial
9       appearance unreasonable and did it violate his
        Sixth-Amendment right to a speedy trial under *Doggett*
10      *v. United States*, 505 U.S. 647 (1992), and *Barker v.
        Wingo*, 407 U.S. 514 (1972)</u>?**

11

12     The Sixth-Amendment right to a speedy trial is triggered

13  upon arrest or formal charge.   *See United States v. Marion*, 404

14

15

16  ────────────

17      [7]   Defendant has not brought a direct challenge based on
    the Sixth Amendment right to counsel.   While failing to directly
18  address Defendant's CJA Plan argument,  the government attempts
    to address whether Defendant had a sixth amendment right to
19  trial.   Specifically, the government emphasizes that the right to
    counsel does not attach until the commencement of formal
20  prosecution, either by formal charge, preliminary hearing,
    indictment, information, or arraignment, citing *United States v.
21  Hayes,* 231 F.3d 663, 671-72 (9th Cir. 2000).   The government then
    asserts that the sixth amendment right to counsel did not attach
22  in this case because "the defendant made no court appearance [but
    was] released on a Saturday by Yosemite National Park after he
23  had 'sobered' up."   (Doc. 26 at 17.)   Means had been arrested
    without a warrant and issued a citation for Driving While
24  Intoxicated.   Apart from the citation, no other formal charges
    have ever been filed in this case.   Yet, Means pled guilty and
25  was sentenced, all based upon the citation as the formal charging
    document.   The issuance of the citation was the commencement of
26  formal prosecution.   Nevertheless, Defendant has not demonstrated
    that the failure to promptly inform Defendant of his right to
27  counsel warrants dismissal under the circumstances.

28

U.S. 307 (1971).[8]  Courts must look to the following four factors in determining whether postcharge delay constitutes a speedy-trial violation:

> 1)   whether the delay was uncommonly long;
>
> 2)   the reason for the delay;
>
> 3)   whether the defendant asserted his speedy-trial rights in due course; and
>
> 4)   whether the defendant suffered prejudice as a result of the delay.

*See Doggett v. United States*, 505 U.S. 647, 650-51 (1992).

The first inquiry, length of delay, must be broken down into two separate steps.  *Id*. at 651-52.  As a threshold matter "[t]o trigger a speedy trial inquiry, an accused must show that the period between indictment and trial passes a threshold point of 'presumptively prejudicial' delay."  *Id*.  If this threshold is not satisfied, the court should not proceed with the remainder of the four part inquiry.  *Id*.  Generally, delays approaching one year have been deemed "presumptively prejudicial."  *United States v. Beamon*, 992 F.2d 1009, 1012-13 (9th Cir. 1993).  One case out of the Second Circuit concluded that a delay of eight months satisfied the threshold requirement, *United Stats v. Vassell*, 970

---

[8]   The Sixth Amendment right to a speedy trial must be distinguished from the statutory right to a speedy trial set forth in the Speedy Trial Act, 18 U.S.C. § 3161, et seq., which provides that "the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment."  § 3161(c)(1).  As Means was not charged by information or indictment, the seventy day speedy trial deadline does not apply to him.  Accordingly, Means has not raised the Speedy Trial Act as a defense.

1  F.2d 1162, 1164 (2d Cir. 1992).  No authority concluding that a

2  delay less than six months meets the threshold requirement has

3  been located.

4      Defendant asserts that the 173 day delay was "uncommonly

5  long" particularly in light of the nature of the federal charges

6  filed against Means.  But, the delay does not meet the threshold

7  requirement of *Doggett*.  No cases have been located that suggest

8  a delay of <u>less than six months</u> satisfies the threshold

9  requirement.  The constitutional speedy trial inquiry need go no

10  further.

11      The parties debate at length various aspects of the

12  remaining four-step *Doggett* analysis.  For example, the United

13  States asserts that Means should bear the blame for his delayed

14  presentment because he did not inform NPS of his incarceration in

15  the state system.  Moreover, the United States notes that the

16  defendant failed to raise the speedy trial issue while he was

17  incarcerated in Madera County.  Means responds that it is

18  "asinine" to assert that the delay was his fault, as the

19  government failed to obtain judicial approval to impose

20  conditions upon his release, including the condition that he

21  appear before the Magistrate on November 16, 2004.  (*See* Doc. 27

22  at 5.)  However, the law requires that a person who is cited out

23  of custody on his own recognizance must be given a finite court

24  appearance date as part of the release and promise to appear.

25      Means then reiterates how he was prejudiced by the delay in

26  appointing him counsel on federal charges, in that he missed his

27  opportunity to request that his federal sentence run concurrent

28  with his state sentence.  But Defendant is not entirely without

**25**

1  fault in this respect.  Defendant knew the date he had promised

2  to make his initial appearance in federal court.  Although it may

3  be inappropriate to hold his failure to appear against him, as

4  the requirement of appearance and/or written notification of

5  change of address was not imposed upon him by a judicial officer,

6  he was aware of his appearance date, he could have he notified

7  NPS or the magistrate court of his incarceration or he could have

8  asked any state lawyer representing him to notify the federal

9  court.  Means was not a stranger to the criminal justice system.

10 He knew that he could not simply ignore a required court

11 appearance.

12      Finally, Means cites authority that supports the proposition

13 that the length of the delay must be examined in light of the

14 degree of culpability or negligence of the government's actions.

15 *See Beamon*, 992 F.2d at 1013.  Means suggests that the government

16 had a constitutional obligation to ask for his prompt return to

17 face his federal charges and that the government's failure to do

18 so was negligent.  In support of this assertion, Means cites

19 *United States v. Geelan*, 520 F.2d 585 (9th Cir. 1975).  In

20 *Geelan*, an individual who allegedly committed a string of bank

21 robberies in both Arizona and California was arrested and charged

22 by Arizona authorities with bank robbery.  Shortly thereafter, he

23 was indicted by a district court in California for a different

24 bank robbery, and the federal authorities placed a detainer

25 against him.  The Arizona courts found Geelan incompetent to

26 stand trial and committed him to a state mental hospital.  After

27 almost five years in the hospital, he was deemed competent to

28 stand trial on the state charges.  But, those charges were

**26**

1  subsequently dismissed.  Geelan was then handed over to the

2  United States Marshal and arraigned on the federal bank robbery

3  charge, almost six years after his arrest.  The *Geelan* court

4  concluded that this six year delay was presumptively prejudicial

5  (i.e., that it satisfied the threshold requirement).  *Id*. at 587.

6  The Ninth Circuit determined that, during the time Geelan was

7  committed to the state mental hospital, the United States had

8  breached its obligations to (1) determine that there was a

9  substantial probability that he would attain capacity in the

10 foreseeable future and (2) monitor that he was making progress

11 toward that goal.  *Id*. at 588.  As a result, the *Geelan* court

12 concluded that Geelan's potential defense of insanity was

13 severely prejudiced by the lapse of more than seven years.  *Id*.

14 at 589.

15     There are essentially no parallels between *Geelan* and the

16 instant case.  Not only is the threshold requirement of unlawful

17 delay not satisfied, but Means has failed to establish that his

18 defense on a misdemeanor has been prejudiced in any way by the

19 delay.  The only potential prejudice he claims, was the possible

20 loss of an opportunity "to have his state and federal sentences

21 run concurrently."  This is addressed below.

22

23     D.   **Assuming that a violation of Mr. Means's rights
24          relating to presentment before the magistrate court is
             found, what is the appropriate remedy**?

25     As discussed above in the context of Means' various theories

26 to support dismissal, Means has utterly failed to establish that

27 dismissal is an appropriate sanction under the facts of this

28 case.  In his opening brief, in a section that purports to

**27**

1  directly address the propriety of dismissal, Means first argues

2  that dismissal is warranted under *Alabama v. Bozeman*, 533 U.S.

3  146, 156 (2001).  That case concerned a transfer of a prisoner

4  from a federal correctional institution to state custody and then

5  back to federal custody that violated the IAD.  Because the IAD

6  does not apply here, *Bozeman* is distinguishable and cannot

7  support dismissal in this case.

8       Next, Means argues that dismissal is warranted because the

9  "Fourth Amendment independently requires that charges stemming

10 from an illegal warrantless arrest must be dismissed," citing

11 *Almeida-Sanchez v. United States*, 413 U.S. 266 (1973), *United*

12 *States v. Majouraru*, 474 F.2d 766 (9th Cir. 1973).  (Doc. 21 at

13 11.)  This argument is totally misplaced.  First, Means does not

14 suggest (nor could he) that NPS lacked probable cause to arrest

15 him for speeding and driving under the influence.  As those are

16 the charges Means now seeks to have dismissed, there is no basis

17 for dismissal, because the DUI/speeding arrest was lawful.

18 Moreover, none of Means' other Fourth Amendment grounds have any

19 merit.  NPS had probable cause to detain him on the parole

20 detainer and no Fourth Amendment presentment violation occurred

21 with respect to Means' federal charges because he was released

22 from federal custody within 24 hours following his arrest.  He

23 was never arrested on state charges as he was subject to a parole

24 hold and was retained in custody by the state for alleged

25 violation of parole.

26      Means next suggests that dismissal is warranted because NPS

27 has exhibited an "ongoing failure to present defendants before

28 USMC in YNP" and that this constitutes an "extraordinary

**28**

1   violation of the rights of many individuals in the park." (Doc.

2   21 at 11.)  Specifically, Means maintains that this potential for

3   widespread abuse warrants dismissal in this case as "the

4   incentive for NPS to establish procedures to avoid future

5   problems with illegal detentions in YNP."

6         Counsel is aware of several other misdemeanor cases
7         currently pending in USMC at YNP, or on appeal to this
      Court, in which individuals suspected of petty offenses
8         were taken into custody and held for more than
      twenty-four hours, many of whom, like Mr. Means in this
9         case, were not thereafter presented to USMC for days or
      even weeks. When the prompt-presentment requirement is
10        not met, the effect of its denial can be difficult, at
      best, to determine, particularly in a case such as this
11        one, where the Government alleges no incriminatory
      statements to have been made by Mr. Means during the
12        period of his presentment delay. If the Court declines
      to order a dismissal of the charges in this case, with
13        prejudice, it will confer upon Mr. Means precisely the
      right without a remedy that the Supreme Court has
14        eschewed since Marbury v. Madison, 5 U.S. 137 (1803).
      The potential for NPS to abuse its discretion under
15        Atwater in effectuating warrantless custodial
      detentions of individuals suspected of having committed
16        misdemeanor and petty offenses is enormous in light of
      the number of regulatory offenses that exist in the
17        National Park system and the high volume of law
      enforcement activity in YNP. Only a dismissal with
18        prejudice will provide the incentive for NPS to
      establish procedures to avoid future problems with
      illegal detentions in YNP.
19
20  (Doc. 21 at 11.)

21      The parties engage in an extended debate over whether there

22  are facts in the record to support Means' assertion that there is

23  an ongoing failure on the part of NPS to present defendants in

24  accordance with the law.  Means asserts that it is enough that he

25  made such assertions before the magistrate judge and that the

26  government did not dispute those assertions. Moreover, Means

27  notes that the government admitted in its response to Means'

28  original motion to dismiss that "the process of releasing

defendants on their own recognizance is followed in the majority

1  of the arrests in YNP and it was followed with Devin Means...."
2  (*See* Doc. 27 at 7.)   The government observes that the early
3  release of misdemeanants is to minimize their detention not to
4  delay communication with counsel.   Even assuming that such facts
5  are in the record, Means' has failed to establish that the remedy
6  he seeks for alleged non-prompt presentment is appropriate.
7  Apart from Means' citation to *Marbury v. Madison*, 5 U.S. 137
8  (1803), for the general proposition that violation of every right
9  should have a remedy, Means cites absolutely no authority to
10 support his assertion that dismissal of valid speeding and
11 admitted drunk driving charges against him is an appropriate way
12 to punish NPS or motivate NPS to develop new policies with
13 respect to detention.

14      A few cases do address related questions of whether delayed
15 presentment warrants dismissal.   For example, in *United States v.*
16 *D.L.*, 453 F.3d 1115, 1125-26 (9th Cir. 2006), a juvenile was
17 detained in a manner that violated various procedural protections
18 set forth in the Juvenile Detention Act.   The juvenile eventually
19 gave a confession that constituted the only evidence that he
20 "knowingly" committed a crime, a requirement of the particular
21 crime alleged.   The Ninth Circuit remanded the case to the
22 district court for it to determine whether the government used
23 the confession to prove up the essential element of knowledge
24 before the grand jury.   If so, the JDA violation was prejudicial
25 because it led the government to initiate prosecution of the
26 juvenile, and the "remedy is for the charges against the juvenile
27 to be dismissed."   *Id*. at 1126.   Here, however, there is no
28 evidence, apart from the alleged potential sentence coordination,

**30**

fm

1  that any prejudice resulted from the delayed presentment.
2  Dismissal is not warranted here, although a remedy may lie in the
3  modification of Means's sentence

4

5       **E.**   **Term of Probation**.

6       Means was sentenced to two years probation and fined $1,500
7  for operating a motor vehicle with blood alcohol concentration in
8  excess of .08.  If the case had been sooner presented, Means
9  could have received the benefit of federal counsel's legal advice
10 on coordinating the dispositions in the state and federal cases.
11 There is no evidence why his state defense counsel (if any) did
12 not raise this issue when he or she appeared with Means in Madera
13 County Superior Court on the violation of parole.  It is
14 appropriate for this issue to be remanded for consideration by
15 the Magistrate Judge.

16                    **VI.**   **CONCLUSION**

17      For the reasons set forth above:

18 (1)    Defendant's motion to dismiss and set aside his
19             conviction is **DENIED;** the conviction is **AFFIRMED.**

20 (2)    The Case is **REMANDED** for the Magistrate Judge to
21             consider the sentence imposed, and whether Means should
22             be given any time credit against his federal term of
23             probation by virtue of any delay in presentment on the
24             federal charges.

25

26 IT IS SO ORDERED.

27 **Dated:   November 15, 2006**          **/s/ Oliver W. Wanger**
   b2e55c                          UNITED STATES DISTRICT JUDGE
28

                         **31**